# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*
INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. §§ 2, 371, 1512(c)(2), 1752(a),  2101 AND 40 U.S.C. §§ 5104(e) (2)(D) AND (G)

)
)
)
)
)
)
)

Case No. 21-sc-544

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|

18, U.S.C 18 § 371 - Conspiracy; 18 U.S.C. § 2 Aiding & Abetting; 18 U.S.C. §1512(c)(2) - Obstruct Official Proceeding; 18 U.S.C. § 1752(a) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 18 U.S.C. § 2101 - Riots; 40 U.S.C. § 5104(e)(2)(D)(G)- Violent Entry and Disorderly Conduct on Capitol Grounds.

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Eric S. McGuire, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: _____02/17/2021_____

_____
*Judge's signature*

City and state: ___Washington, D.C.___

G. Michael Harvey, U.S. Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  21-sc-544 |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT | ) | |
| PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. | ) | |
| 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. §§ 2, 371, | ) | |
| 1512(c)(2), 1752(a),  2101 AND 40 U.S.C. §§ 5104(e)(2)(D) AND (G) | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See attachment A, incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See attachment B, incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____March 3, 2021_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   ___02/17/2021___          _____
                                                                           *Judge's signature*

City and state:   ___Washington, D.C.___          ___G. Michael Harvey, U.S. Magistrate Judge___
                                                                           *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-sc-544 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

> I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____          _____
                                                    *Executing officer's signature*

                                                _____
                                                    *Printed name and title*

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information which is associated with the Google account(s) identified by zylowolf@gmail.com and which is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California.

## ATTACHMENT B

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.     Information to be disclosed by Google LLC ("PROVIDER") to facilitate
execution of the warrant**

To the extent that the information described in Attachment A is within the possession,
custody, or control of PROVIDER, including any records that have been deleted but are still
available to PROVIDER, PROVIDER is required to disclose the following information to the
government corresponding to each account or identifier ("Account") listed in Attachment A:

a.     For the time period November 3, 2020 – present: The contents of all
communications and related transactional records for all PROVIDER services used by an Account
subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo
sharing or storage services, remote computing services, instant messaging or chat services, voice
call services, or remote computing service (e.g., Google Drive), including but not limited to
incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic
communications; attachments to communications (including native files); source and destination
addresses and header or routing information for each communication (including originating IP
addresses of e-mails); the date, size, and length of each communication; and any user or device
identifiers linked to each communication (including cookies); electronic communication services
such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant
messaging and video chats), Google+ (social networking), Google Groups (group discussions),
Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such
as Google Search (internet searches), Web History (bookmarks and recorded browsing history),
and Google Chrome (web browser); online productivity tools such as Google Calendar, Google

Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications);

  b. For the time period November 3, 2020 – present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services (e.g., Google Drive), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

  c. For the time period November 3, 2020 – present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

  d. For the time period November 3, 2020 – present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts)

ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      For the time period of November 3, 2020 - present: All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.      For the time period November 3, 2020 – present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken; and

j.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 7 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

SA Eric McGuire
Washington Field Office
601 4th St NW,
Washington, D.C. 20535
Email: esmcguire@fbi.gov

**II.       Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1512(c)(2), 1752(a), 2101, and 40 U.S.C. §§ 5104(e)(2)(D) and (G), as well as conspiracy (18 U.S.C. § 371) and aiding and abetting (18 U.S.C. § 2) efforts to do same (collectively, the "SUBJECT OFFENSES"), as described in the affidavit submitted in support of this Warrant, including, for each Account, items, records, documents, or information pertaining to the following matters:

a.       the identification or location of the user(s) of the Account;

b.       how and when the Account was accessed or used, to determine the geographic and chronological context of Account access, use, and events relating to the SUBJECT OFFENSES and to the Account user(s);

c.       the identification of the Subject and other persons, including photographs and videos depicting clothing and other articles and paraphernalia that reflect evidence of having been present at or near the U.S. Capitol Building on or around January 6, 2021;

d.       the identification of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the SUBJECT OFFENSES; or (ii) communicated about matters relating to the SUBJECT OFFENSES, including records that help reveal their whereabouts;

e.       the U.S. Capitol Building, including any maps or diagrams of the Building or its internal offices, or presence at, or inside of or on the grounds of, the Building on or around January 6, 2021, including any planning, preparation, or travel;

f.  challenges to or questions about the legitimacy of the 2020 Presidential Election, including awareness of, or any efforts or intent to disrupt, the certification process of the 2020 Presidential Election, or otherwise influence the policy or composition of the United States government by intimidation or coercion;

g.  materials, devices, tools, plans, or strategies to enter or assist others in entering the U.S. Capitol Building on or about January 6, 2021, by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray or smoke grenades;

h.  communication devices, including closed circuit radios, walkie-talkies, or secure or encrypted "apps," related to the directing of others or direct presence at, inside of, or on the grounds of, the U.S. Capitol Building on or around January 6, 2021;

i.  any conspiracy, planning, or preparation (including financing) to commit the SUBJECT OFFENSES, or efforts to conceal evidence of the SUBJECT OFFENSES from law enforcement, or to flee prosecution for the SUBJECT OFFENSES;

j.  the state of mind of the Subject and/or co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation, planning, knowledge, or experience, including but not limited to tactical training or tactical equipment, related to the SUBJECT OFFENSES;

k.  assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

l.  damage to, or theft of, property at the United States Capitol on January 6, 2021; and

m.      affiliation or communication with the Proud Boys, including members thereof.


This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. §§ 2, 371, 1512(c)(2), 1752(a),  2101 AND 40 U.S.C. §§ 5104(e)(2)(D) AND (G)** | **SC No. 21-sc-544** <br><br> **Filed Under Seal** |

*Reference:      USAO Ref. # 2021R00318; Subject Account(s): zylowolf@gmail.com*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Eric McGuire, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information which is associated with one account – that is, zylowolf@gmail.com (the "Account") – which is stored at premises controlled by Google LLC ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at / which accepts service at 1600 Amphitheatre Parkway, Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment

9

B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so since February 2010.  As such, I am an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code. I have been the lead agent for investigations targeting global criminal organizations. I have testified during an array of judicial proceedings, conducted physical and electronic surveillance, administered confidential sources, and received training as investigative techniques evolve. I have interviewed hundreds of defendants, witnesses, and informants.   In addition to my regular duties, I am currently also tasked with investigating criminal activity that occurred in and around the Capitol grounds on January 6, 2021.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 1512(c), 1752(a), 2101, 40 U.S.C. § 5104(e), and conspiracy (18 U.S.C. § 371) and aiding and abetting (18 U.S.C. § 2) to commit violations of same have been committed by Arthur Stanley JACKMAN and other identified and other identified persons associated with JACKMAN.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

**JURISDICTION**

10

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

6.      Arthur Stanley JACKMAN is a 29 year-old resident of the state of Florida. JACKMAN is a self-admitted member of a group known as the Proud Boys, and he has a Proud Boys tattoo on his left wrist.

7.      Proud Boys is a nationalist organization with multiple U.S. chapters and potential activity in other Western countries. The group describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists."  Proud Boys members routinely attend rallies, protests, and other First Amendment-protected events, where certain of its members sometimes engage in acts of violence against individuals whom they perceive as threats to their values.  The group has an initiation process for new members, which includes the taking of an "oath." Proud Boys members often wear the colors yellow and black, as well as other apparel adorned with Proud Boys-related logos and emblems.

*Proud Boys' Appearances at Demonstrations in Washington, D.C.*

8.      On or about November 14, 2020, the "Million MAGA March" was held in Washington, D.C. The Million MAGA March was a widely-attended demonstration in Washington, D.C., which was organized as a peaceful exercise of demonstrators' First Amendment rights with respect to the 2020 Presidential election. Members of the Proud Boys attended the

11

demonstration wearing their yellow and black colors and other recognizable emblems and logos associated with the group.

9.     On or about December 12, 2020, a similar demonstration took place in Washington, D.C. (the "December Demonstration"). Like the Million MAGA March, the December Demonstration was organized as a peaceful First Amendment demonstration, and one focus of the demonstration was to protest against the vote of the Electoral College on that upcoming Monday, December 14, 2020. Certain persons dressed in Proud Boys colors and wearing Proud Boys emblems and logos attended the demonstration. According to a voluntary statement that JACKMAN provided to law enforcement, JACKMAN was in Washington, D.C. with other Proud Boys members on December 12, 2020.

*Communications by the Proud Boys About the January 6 Demonstration at the U.S. Capitol*

10.     Your affiant has reviewed publicly available posts by the account identified as @NobleLead (vanity name: Tarrio Unchained) on the social media platform Parler.[1] At the time of this writing, the Parler site is unavailable; however, certain public-facing posts by the account described herein are available on the Internet Archive's "wayback machine." The Internet Archive functions to preserve certain publicly available internet pages at particular moments in time, i.e., it takes a snapshot of the appearance of a public-facing webpage. As a result, one can use the Internet Archive's "wayback machine" to retrieve website information from a particular time if a snapshot was taken of the particular public-facing webpage. I have been advised by other agents at the FBI that the Internet Archive employs a process that produces a historical snapshot that

---

[1] Parler is a social media platform similar in nature to Twitter, Facebook, and Instagram. Events such as the Million Maga March were widely shared and discussed using the Parler platform.

accurately records the content of publicly available web pages on the day that the snapshot was taken.

11.    As described in more detail herein, I have probable cause to believe that @NobleLead is operated or controlled by or at the direction of Enrique Tarrio. As shown in the image below, the header of @NobleLead attributes the account to vanity name "Tarrio Unchained" and indicates that the operator is the "Proud Boy Chairman." I know from this investigation that Tarrio holds himself out as the national leader of the Proud Boys. In addition, various photographs of Tarrio appear in the posts on @NobleLead. Furthermore, as described in more detail below, certain postings by @JoeBiggs, which is believed to be operated or controlled by or at the direction of Biggs, are "echoed" or reposted by @NobleLead.



12.    As described in more detail herein, I have probable cause to believe that the Parler account @JoeBiggs (vanity name: Joe Biggs) is operated or controlled by or at the direction of Joseph

13

Biggs. Biggs[2] is a self-described organizer of events and demonstrations attended by the Proud Boys. The vanity name and account name both match the true name of Biggs. In addition, a person that I recognize as Biggs appears in at least one picture and one video posted on the account. For example, on or about January 1, 2021, @JoeBiggs posted a message that contained a photograph of a person that I recognize as Biggs and one other person. In the photo, Biggs appears to be taking a selfie. The post was then "echoed" or reposted by @NobleLead (Tarrio), along with a comment "Bullsh**, I ain't there." Your affiant understands this comment by @NobleLead (Tarrio) to be in reference to the fact that the person in the photo looks vaguely like Tarrio, but is not believed to be Tarrio.

---

[2] Biggs has been charged in this Court, Case No. 21-mj-126 (RMM), with violations of 18 U.S.C. §§ 1512(c)(2), 1752(a), and 40 U.S.C. § 5104(e)(2)(D) and (F) in connections with his actions at the Capitol on January 6, 2021.



13.     On or about September 29, 2020, during a Presidential debate, President Donald J. Trump was asked, in substance, about violence that was taking place in various cities across America in connection with protests for social justice. President Trump responded, in part, with a reference to the Proud Boys, in which he admonished them to "Stand back, and stand by."

14.     On or about December 19, 2020, President Trump announced plans for further protests of the election via post on Twitter. Specifically, the Tweet read, "A great report by [NAME REDACTED]. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!"

15.     Shortly thereafter, in December 2020, public communications from Proud Boys leadership encouraged members of the Proud Boys to attend the January 6, 2021, demonstration in Washington, D.C. As described in more detail below, such communications included messages on social media sent by Tarrio and Biggs.

16.     For example, on or about December 28, 2020, Tarrio (using @NobleLead) posted a message that read "I'll be making an announcement about @theproudboys and Jan 6th tomorrow…" The message then continues, "Chess…always chess." Based on your Affiant's familiarity with social media sites, your Affiant believes that the reference to @theproudboys is a reference to another account on the platform.

17.     The next day, on or about December 29, 2020, Tarrio (using @NobleLead) posted a message on the social media site Parler about the demonstration planned for January 6, 2021. Among other things, Tarrio announced that the Proud Boys would "turn out in record numbers on Jan 6th but this time with a twist… We will not be wearing our traditional Black and Yellow. We will be incognito and we will be spread across downtown DC in smaller teams. And who knows….we might dress in all BLACK for the occasion." I believe the statement about dressing in "all BLACK" is a reference to dressing like the group known as "Antifa," who the Proud Boys have identified as an enemy of their movement and are often depicted in the media wearing all black to demonstrations.

18.     On or around the same day, Biggs (using @JoeBiggs) posted a similar message to his followers on Parler in which he stated, among other things, "we will not be attending DC in colors. We will be blending in as one of you. You won't see us. You'll even think we are you.  We are going to smell like you, move like you, and look like you. The only thing we'll do that's us is

16

think like us! Jan 6th is gonna be epic." I understand that Biggs was directing these statements at "Antifa."

19.    Separately, Biggs has described the Proud Boys' efforts, in general, to plan for demonstrations and events attended by the Proud Boys. In an interview that was purportedly taped in December 2020 and posted online on or about January 3, 2021, Biggs described how he, as an organizer of Proud Boys events, sets about planning them. Biggs explained, in part:

> When we set out to do an event, we go alright, what is or main objective? And that's the first thing we discuss. We take three months to plan an event. And we go, what's our main objective? And then we plan around that, to achieve that main objective, that goal that we want.

20.    On or around January 1, 2021, Tarrio (using @NobleLead) posted a message that read "Lords of War." The post was also "tagged" with the identifiers "#J6" and "#J20." Your affiant believes that the references to #J6 and #J20 refer to January 6 and January 20, 2021, the dates of the Certification of the Electoral College for the 2020 Presidential Election and the 2021 Presidential Inauguration, respectively. The message included a picture of a group of men that are wearing Proud Boys colors, logos, and emblems. The person depicted in the center of the photograph is believed to be Proud Boy Dominic Pezzola, who has been charged with, among other things, 18 U.S.C. §§ 1361 and 1752, for his unlawful breaking of a window and entry into the U.S. Capitol with a riot shield on January 6, 2021.



*JACKMAN's Participation in Unlawful Events at the Capitol on January 6, 2021*

21.    I have studied video footage and still photographs of the January 6, 2021, incursion of the U.S. Capitol, and I have identified an individual in them as JACKMAN through comparison of those images to photographs and videos of JACKMAN that are widely available online.  As described herein, the images and video footage that I have reviewed, as well as the other facts gathered in this investigation, establish that JACKMAN did conspire with others to unlawfully enter the U.S. Capitol by means of destruction of federal property and did corruptly obstruct the official proceedings underway at the U.S. Capitol on January 6, 2021.

22.    On January 6, 2021, individuals that I have identified as a group of people that hold themselves out as Proud Boys were depicted on the east side of the U.S. Capitol. Consistent with the directive issued by organizers of the Proud Boys, including Tarrio and Biggs, none of the men

18

pictured are wearing Proud Boys colors of black and yellow, but are instead dressed "incognito." Indeed, Biggs, wearing glasses and a dark knit hat, is dressed in a blue and grey plaid shirt.



23.     Biggs was identified in a video taken by a man purporting to be a member of the Proud Boys ("Individual A").  Specifically, Individual A gave an interview to ABC Action News, which was published online on January 9, 2021.  As part of that interview, Individual A shared footage that Individual A claims was taken on January 6, 2021, while Individual A and others were participating in the demonstration.  In the version of the interview produced online, Individual A can be heard saying, "Yeah, that's Joe Biggs, that's Rufio."  Based on my investigation, I understand Individual A to be identifying the man in the plaid shirt as Biggs, and the man in the

sunglasses as Proud Boy Ethan Nordean[3], a/k/a Rufio Panman. Standing at the left is someone that I recognize as another Proud Boy, Zach Rehl.



24.    At or around January 6, 2021, Biggs, Nordean, Rehl, and others were observed marching at the front of a group of individuals on Constitution Avenue, Northwest, in the area around First Street, Northwest. The group was engaged in various chants and response calls, including "F*** Antifa!" and "Whose streets? Our streets!" Your affiant has not identified footage that shows JACKMAN within this group of individuals.

25.    Biggs, Nordean, Rehl, and others then stopped at or around 12:15 p.m. near Second Street and Constitution Avenue, NW. Your affiant has not identified footage that shows JACKMAN within this group of individuals.

---

[3] Ethan Nordean was arrested on February 3, 2021, and charged in Case No. 21-mj-195, with 18 U.S.C. §§ 1512(c)(2), 1361 (aiding and abetting), 1752(a), and 40 U.S.C. § 5104(e)(2)(D) and (F).

*A Crowd Advances Towards the U.S. Capitol*

26.     U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

27.     At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

28.     The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

29.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

30.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which

took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00

p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m. EST, the House

and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike

Pence was present and presiding, first in the joint session, and then in the Senate chamber.

31.    As the proceedings continued in both the House and the Senate, and with Vice

President Pence present and presiding over the Senate, a large crowd gathered outside the U.S.

Capitol.  As noted above, temporary and permanent barricades were in place around the exterior

of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from

the Capitol building and the proceedings underway inside.

32.    At around 1:00 p.m. EST, known and unknown individuals broke through the police

lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and

supporting law enforcement officers there to protect the U.S. Capitol.

33.    The image below depicts a large crowd that was gathered near the pedestrian

entrance to the Capitol grounds on First Street at around 1:00 p.m. EST. The entrance was secured

by a small number of USCP, who stood behind a waist height metal barrier.



34.     Biggs was present in the crowd depicted above, and Biggs attempted to lead others in various chants using a megaphone.

35.     Shortly after that above image was captured on video, two men walked to the edge of the pedestrian walkway and then began walking defiantly toward a waist-high metal gate, which was being guarded by only a handful of U.S. Capitol Police.



36.     The crowd followed, and within minutes, the crowd overwhelmed the U.S. Capitol Police officers seen at the top of the steps in the image above. The crowd then advanced toward the U.S. Capitol. Your affiant asserts that Biggs was not one of the two men who initially advanced toward officers, but was present in the crowd depicted in the image above.

37.     After overwhelming USCP at the pedestrian gate, the crowd advanced on the U.S. Capitol where another line of U.S Capitol Police and barricades attempted to stop the crowd from advancing to the walls of the building. Among those leading the walk to the next barrier were Proud Boys Dominic Pezzola (in black hat and sunglasses below) and William Pepe (in flag

bandana below).[4] Upon arriving at the next barrier, Pepe dragged a segment of the fence away, which left U.S. Capitol Police officers temporarily without barrier.





[4] Dominic Pezzola and William Pepe were charged by indictment on January 29, 2021, in case number 21-cr-52. Charges include conspiracy to interfere with law enforcement as well as other individual charges, for their actions at and inside the U.S. Capitol on or about January 6, 2021. As described below, Pezzola has been photographed at Proud Boys rallies.  The FBI also executed search warrants at both Pezzola's and Pepe's residences and found Proud Boys paraphernalia.

24

38.    The next police line was overwhelmed by crowds and the crowd advanced to the front of the U.S. Capitol. Additional people continued to arrive until what I estimate to be thousands of people had gathered in front of the Capitol on its west side.

39.    A person that I recognize as JACKMAN (on left) can be seen in the image below standing in close proximity to Proud Boys Biggs and Rehl (on right).



40.    At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

41.    At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such

time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

42.     Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.

43.     Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  USCP ordered a similar lockdown in the House chamber.

44.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

45.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

46.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

47.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence

remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

48. Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

49. Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

50. Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

51. During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

52. Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

53. Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

27

*Arrest of Proud Boys Member Dominic Pezzola*

54.     On January 8, 2021, FBI received a lead depicting publicly available photographs and videos of an unknown individual breaking the window of the U.S. Capitol Building, which is located in Washington, D.C., with a clear plastic shield, and then entering the Capitol building. Below are screen shots from one such video.



55.     The individual has since been identified as Dominic Pezzola. Pezzola is an identified member of the Proud Boys, as can be seen in the image below, which was taken during a Make America Great Again (MAGA) rally in Washington, D.C. on or about December 12, 2020. Indeed, the photograph is identical or nearly identical to the photograph posted by Tarrio (using

@NobleLead) with the tags #J6 and #J20, as referenced above in Paragraph 20.



*Arrest of Proud Boys Member Joe Biggs*

56.     I have reviewed video footage that was live streamed on the social media site Parler

on January 6, 2021. One of those clips shows what I believe to be people entering the Capitol

shortly after the events described in the preceding Paragraphs 54 - 55. One of those individuals,

who entered the door within approximately 50 seconds of its opening,[5] is a person that I believe to

---

[5] Your affiant is aware that previous affidavits submitted in connection with this investigation
stated that based on time stamps on social media posts, this intrusion happened within 20 seconds
or approximately 20 seconds of the opening of the door.  Based on additional photographic and
video evidence depicting Biggs inside the capitol, the timestamps associated therewith, and other
information collected in the course of this investigation, your affiant now asserts that the time of
entry is within approximately 50 seconds of the opening of the door.

be Biggs. In the video, a voice off camera says, "Hey Biggs, what do you gotta say?" The person depicted below smiles broadly and replies, "this is awesome!" before pulling his gaiter up to cover his face.



57.     On or about January 18, 2021, Biggs spoke with agents of the FBI after video emerged online of him inside the U.S. Capitol. Biggs stated, in substance and in part, that he was present in Washington, D.C. for the demonstration on January 6, 2021. Biggs admitted to entering the Capitol building on January 6, 2021, without forcing entry.  Biggs informed the interviewing agent that the doors of the Capitol were wide open when he made entry into the building.  Biggs denied having any knowledge of any pre-planning of storming the Capitol, and had no idea who planned it.

58.      Biggs has since been charged in this Court, Case No. 21-mj-126 (RMM), with violations of 18 U.S.C. §§ 1512(c)(2), 1752(a), and 40 U.S.C. §§ 5104(e)(2)(D) and (F) in connections with his actions at the Capitol on January 6, 2021.

*Activities of Proud Boys Leader Enrique Tarrio*

59.     On December 13, 2020, Tarrio and other persons dressed in Proud Boys colors and emblems destroyed a "Black Lives Matter" banner displayed by a church in Washington, D.C. Tarrio charged by criminal complaint on or about December 30, 2020 (2020 CRWSLD 5553), and Tarrio was arrested in Washington, D.C. on January 4, 2021. As part of his conditions of release, Tarrio was ordered to stay away from the entire District of Columbia for the pendency of his case, to include the events on January 6, 2021. As of the writing of this warrant, Tarrio's criminal case is still pending, however, Tarrio has admitted through various platforms, including Parler, that he was responsible for banner's destruction.

60.     On or about January 6, 2021, Tarrio (using @NobleLead) posted several messages on Parler that appear to reference the incident at the U.S. Capitol. Among other messages, Tarrio wrote, at least in part: "Don't f*cking leave" and "After I finish watching this I'll make a statement about my arrest. But for now I'm enjoying the show." With this post, Tarrio included a picture of what I believe to be the emperor from the Star Wars Episode VI: Return of the Jedi.



61.     Tarrio also posted a message that read: "Proud Of My Boys and my country." I recognize "Proud Of My Boys" to be a declaration of encouragement or congratulations used by the Proud Boys.

62.     Tarrio (using @NobleLead) also posted a message that appears to show a rioter in one of the chambers of the U.S Congress. The post read simply: "1776."

*JACKMAN's Presence at the Capitol on January 6, 2021*

63.     On or about January 22, 2021, federal agents with the FBI interviewed a witness (W-1).  W-1, a childhood friend of JACKMAN, reported to FBI that W-1 had texted JACKMAN during the Capitol riots and asked JACKMAN whether he was involved.  According to W-1, JACKMAN texted back that he was, and subsequently texted a photo of himself inside the Capitol. W-1 asserted that W-1 had deleted the text and picture, but W-1 asserted that before doing so, W-

1 had sent the text and picture to another individual (W-2). W-2 subsequently provided a photograph to the FBI that W-2 asserted IT had received from W-1. Such image is included below.



64.    W-1 also provided the FBI with a video that had been recorded by a New Yorker reporter and subsequently posted online. In the video, W-1 identified the person seen below in the red plaid shirt with black gaiter as JACKMAN. The screen capture below shows JACKMAN walking up a flight of stairs behind a person that I recognize as wearing the same clothing as Proud Boy organizer, Joe Biggs. In the second image below, JACKMAN can be seen with his hand on such person's shoulder.



65.     Based on my extensive review of video footage of the events of January 6, 2021, your affiant asserts that JACKMAN can also be seen in the image below standing in the gallery of the Senate chamber.



66.     Another screen capture of the video appears to show JACKMAN taking a "selfie" inside the Senate chamber. Notably, JACKMAN's cell phone appears to have insignia that I recognize as being associated with the Proud Boys (i.e., a yellow laurel wreath co-opted from the clothing brand, Fred Perry). In the selfie, JACKMAN appears to be making a gesture that I recognize as being associated with the Proud Boys (i.e., the "okay" symbol). Such evidence indicates that JACKMAN is associated with the Proud Boys.

34



67.     Your affiant notes that the photograph that was provided by W-2 (and seen in Paragraph 63) appears to be a mirror image of the image that could have been captured by a "selfie" taken in the preceding paragraph.

68.     On or about January 19, 2021, federal agents with the FBI interviewed JACKMAN at his residence. JACKMAN participated voluntarily. Among other things, JACKMAN stated that:

a.   He was a Proud Boys member and had been since 2016;

b.   He became involved in the Proud Boys to support Donald Trump;

c.   He was in Washington, D.C., on January 6, 2021;

d.   He went to Washington, D.C. to be a "visual representation, to support President Trump and to stop the steal;"

e.   He believes the election was stolen;

f.   He and other Proud Boys were not there to infiltrate the Capitol as it was not a sanctioned Proud Boys event; and

g.   He had "no comment" as to whether he was inside the Capitol on January 6, 2021, or if any pictures would show him inside.

35

69.     On or about February 6, 2021, PROVIDER was served with a Grand Jury Subpoena that sought subscriber records for the Account. On or about February 12, 2021, PROVIDER responded and indicated that the Account is currently registered to user, "Arthur J." The telephone number associated with the Account matches the telephone number registered to "Arthur Jackman" in the wireless provider's records. PROVIDER identified a login to the account as recently as February 8, 2021.

70.     Lawfully-obtained Google records show that a Google account associated with the Account and the telephone number was connected to Google services and was present in or around the U.S. Capitol on January 6, 2021. Specifically, the Google records show that JACKMAN was inside various locations within the Senate wing (*i.e.*, the Northern end) of the Capitol, which is consistent with the photographs included at Paragraphs 63, 65, and 66. As discussed herein, the background of that photograph indicates that the photograph was taken from inside the Senate chamber.

71.     As discussed herein at Paragraphs 63 – 67, JACKMAN appears to have used his cellular telephone to take photographs and communicate while inside the Capitol on January 6, 2021. For the foregoing reasons, I have probable cause to believe that the Account will contain fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1512(c)(2), 1752(a), 2101, and 40 U.S.C. §§ 5104(e)(2)(D) and (G), as well as conspiracy (18 U.S.C. § 371) and aiding and abetting (18 U.S.C. § 2) efforts to do same (collectively, the "SUBJECT OFFENSES") by JACKMAN and other individuals whose identities are both known and unknown to the affiant.

72.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of

violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

73.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

74.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

75.     PROVIDER is the provider of the internet-based account(s) identified by zylowolf@gmail.com (i.e., the Account).

76.     PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online.  PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

77.     Based on my training and experience, I know that PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website.   During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment.   PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

78.     Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[6]

79.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material.   For example, if the subscriber does not delete

---

[6] Here, PROVIDER's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

80.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; social networking.  Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

81.     Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e*., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDER also

commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

82.      Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

83.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices.  This application is associated with the subscriber's PROVIDER account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

84.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to

41

PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

85.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

86.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

87.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic

communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

88.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by PROVIDER can show how and when the account was accessed or used.  For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account.  Additionally, information

43

stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[7]

89.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically

---

[7] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

90.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Jason B.A. McCullough, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

91.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

                                        Respectfully submitted,

                                        _____
                                        Eric McGuire
                                        Special Agent
                                        Federal Bureau of Investigation


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on February 17, 2021.




_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC**
**RECORDS PURSUANT TO FEDERAL RULES OF**
**EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____
[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____

_____     _____
Date                          Signature